FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ NOV 3 0 2006 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                      ::
SAMUEL EDMONSON,                                                      :     04-CV-5477 (ARR)

                                          Plaintiff,                  :     NOT FOR ELECTRONIC
                                                                      :     OR PRINT
          -against-                                                   :     PUBLICATION

DALE ARTUS, Superintendent, Clinton Correctional                     :     OPINION AND ORDER
Facility,                                                             :

                                          Defendant.                  :
                                                                      X
--------------------------------------------------------------------

ROSS, United States District Judge:

Petitioner, Samuel Edmonson, filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 on December 6, 2004. Subsequent to submission of his petition pro se but prior to

the submission of a memorandum of law, petitioner retained counsel. In petitioner's

memorandum of law, he claimed that: (1) his conviction was barred by double jeopardy because

jeopardy attached in a forfeiture proceeding initiated prior to trial; (2) his due process rights were

violated when the state trial court did not conduct an individual voir dire about pre-trial publicity;

(3) his due process rights were violated when the state trial did not re-open the Wade hearing

after evidence was presented indicating that one of the identifying witnesses had previously

viewed petitioner at a stationhouse show-up; (4) his trial counsel was ineffective; and (5) the

$18.9 million fine levied as part of his sentence violated the Eighth Amendment's prohibition on

excessive fines. For the reasons set forth below, the court dismisses his petition.

## BACKGROUND

Following a jury trial in New York State Supreme Court, Kings County, petitioner was

convicted of two counts of murder in the second degree, one count of attempted murder in the

second degree, three counts of criminal possession of a weapon in the second degree, and enterprise corruption. At trial, the state presented evidence that Mr. Edmonson ran a criminal enterprise that sold crack cocaine in six locations in Brooklyn, with a combined average daily revenue of $100,000. The state also presented evidence that Mr. Edmonson, acting in concert with others, was responsible for the shooting deaths of his partner in the enterprise, Kenneth Rankin, and a worker at one of the sales locations, William May, as well as the attempted murder of another worker, Brian Fleming. On July 11, 1990, petitioner was sentenced to four consecutive prison terms totaling seventy-five years to life and three concurrent terms. The court also imposed a fine in the amount of $18.9 million. Sentencing Hr'g 23-27.

On July 12, 2000, petitioner filed a motion to vacate his conviction pursuant to N.Y. C.P.L.R. § 440.10. Petitioner alleged that trial counsel was ineffective. He also alleged that the prosecution committed misconduct by misrepresenting the date that petitioner became a suspect in the Rankin murder. He contended that this information would have substantiated his allegation that John Prince, an identifying witness, had viewed him during a stationhouse showup on June 30, 1997 prior to identifying him in a photo array and line-up. On October 3, 2000, the New York State Supreme Court denied petitioner's motion without a hearing.

Petitioner's appeal to the Appellate Division, Second Department of the § 440.10 decision was consolidated with petitioner's direct appeal of his conviction. In that action, petitioner made the following claims relevant to the instant petition: (1) double jeopardy bars his conviction because the criminal trial was held subsequent to a civil forfeiture proceeding initiated under N.Y. C.P.L.R. Article 13-A; (2) the trial court should have granted a mistrial due to prejudice of the jury as a result of pre-trial publicity; (3) the Wade hearing was not full and fair, resulting in the admission of identification testimony by a witness tainted by a stationhouse showup; (4) trial counsel was ineffective; and (5) the $18.9 million fine was erroneous and

2

excessive in violation of the Eighth Amendment. Appellant's Br., October 21, 2001. On December 2, 2002, the Appellate Division affirmed petitioner's conviction. People v. Edmonson, 751 N.Y.S.2d 280 (N.Y. App. Div, 2d Dep't 2002). The Appellate Division held that the order of attachment resulting from the civil forfeiture proceeding "did not implicate the Double Jeopardy Clause, since [it was] not punitive in nature" and the action "does not constitute criminal punishment within the meaning of the Double Jeopardy Clause." Id. The Appellate Division further determined that Mr. Edmonson's request for a new trial based on his allegations regarding the Wade hearing was properly denied without a hearing. Id. The Appellate Division dismissed defendant's remaining contentions as "either unpreserved for appellate review or without merit." Id. Thereafter, petitioner sought leave to appeal to the New York State Court of Appeals. Leave to appeal was denied by order dated February 26, 2003. People v. Edmonson, 99 N.Y.2d 614 (N.Y. 2003).

Petitioner subsequently applied for a writ of error coram nobis to vacate his conviction on the grounds of ineffective assistance of appellate counsel. The Appellate Division denied his application on February 17, 2004. People v. Edmonson, 771 N.Y.S.2d 682 (N.Y. App. Div., 2d Dep't 2004). The Court of Appeals denied leave to appeal on May 14, 2004. People v. Edmonson, 2 N.Y.3d 798 (N.Y. 2004).

## DISCUSSION

### I.     AEDPA Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

3

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statutory language "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively reasonable." Id. at 409. In determining whether an application was objectively unreasonable, "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410. Interpreting Williams, the Second Circuit has added that, although "[s]ome increment of incorrectness beyond error is required[,] . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citations omitted).

This deferential review of state court judgments is available only when the federal claim has been "adjudicated on the merits" by the state court. Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001). If there is no such adjudication, the deferential standard does not apply, and "we

4

apply the pre-AEDPA standards, and review <u>de</u> <u>novo</u> the state court disposition of the

petitioner's federal constitutional claims." <u>Id.</u> (citing <u>Washington v. Schriver</u>, 255 F.3d 45, 55

(2d Cir. 2001)). For the purposes of AEDPA, a state court "adjudicates" a petitioner's federal

constitutional claims "on the merits" whenever "it (1) disposes of the claim 'on the merits,' and

(2) reduces its disposition to judgment." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 312 (2d Cir. 2001).

When a state court does so, a federal habeas court must defer in the manner prescribed by

AEDPA to the state court's decision on the federal claim, even if the state court does not

explicitly refer to either the federal claim or relevant federal case law. <u>Id.</u> To determine whether

a state court has disposed of a claim on the merits, the court considers: "(1) what the state courts

have done in similar cases; (2) whether the history of the case suggests that the state court was

aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's

opinion suggests reliance upon procedural grounds rather than a determination on the merits."

<u>Id.</u> at 314 (quoting <u>Mercadel v. Cain</u>, 179 F.3d 271, 274 (5th Cir. 1999)). In addition, a

"conclusive presumption" that the state court decision "rest[s] on the merits of the federal claim"

applies to decisions "fairly appearing to rest primarily on federal law or to be interwoven with

federal law, . . . [a]bsent a clear and express statement of reliance on a state procedural bar."

<u>Jimenez v. Walker</u>, 458 F.3d 130, 138 (2d Cir. 2006) (holding that presumption of <u>Harris v.</u>

<u>Reed</u>, 489 U.S. 255, 262-63 (1989), applies equally to both AEDPA-deference and procedural-

bar determinations).

With regard to the claims at issue in the instant petition, the state court's decision

expressly adjudicated the merits of petitioner's claims related to double jeopardy and the <u>Wade</u>

hearing. The court construes the state court's dismissal of petitioner's remaining claims as

"either unpreserved or without merit" as a decision on the merits. <u>See</u> <u>Jimenez</u>, 458 F.3d at 138.

Accordingly, in order to grant petitioner's habeas petition, the state court decision must have

5

been contrary to, or involved an unreasonable application of, federal law. Under this deferential standard, the court reviews each of petitioner's claims in turn.

## I.   **Petitioner's Claims**

### *A.   Violation of Double Jeopardy*

Petitioner alleges that his criminal prosecution was barred by double jeopardy because jeopardy attached in a forfeiture action initiated prior to trial by the State of New York pursuant to New York Civil Practice Law and Rules, Article 13-A. Article 13-A provides, in relevant part, that:

> A civil action may be commenced by the appropriate claiming authority against a criminal defendant to recover the property which constitutes the proceeds of a crime, the substituted proceeds of a crime, an instrumentality of a crime or the real property instrumentality of a crime.

C.P.L.R. § 1311(1). On June 27, 1989, four months after Mr. Edmonson's criminal indictment, New York State initiated a forfeiture action against him, seeking recovery of over $26 million. The forfeiture action was stayed during the pendency of the criminal action, as required by the statute. See C.P.L.R. § 1311(1)(a). However, pursuant to its authority to grant provisional remedies prior to conviction, see id., the New York State Supreme Court entered an order of attachment on December 13, 1989, preliminarily enjoining petitioner from transferring any property interests. Petitioner contends that jeopardy attached when the Supreme Court began hearing evidence on the state's ex parte application for a provisional remedy in the Article 13-A proceedings or, at the latest, when the forfeiture court heard evidence to confirm the ex parte order of attachment. Petitioner therefore alleges that the subsequent criminal trial was barred by double jeopardy.

6

The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution states that "[n]o person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb." The Supreme Court has recognized that "the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could in common parlance be described as punishment. The clause protects only against the imposition of multiple <u>criminal</u> punishments for the same offense." <u>Hudson v. United States</u>, 522 U.S. 93, 99 (1997) (internal quotations and citations omitted).

As an initial matter, the court notes that petitioner's double jeopardy argument rests on the contention that the civil forfeiture action in its entirety implicates double jeopardy. However, in the forfeiture action at issue in the instant petition, only the application for provisional remedies was allowed to go forward prior to the conclusion of the criminal proceeding. Petitioner's argument, therefore, relies on the assertion that jeopardy attached in the forfeiture proceeding during the hearing of evidence in support of the state's application for provisional remedies. In support of this argument, petitioner cites the Second Circuit's decision in <u>United States v. Idowu</u>, 74 F.3d 387 (2d Cir. 1996). In <u>Idowu</u>, the Second Circuit addressed the issue of whether jeopardy attached in an administrative forfeiture proceeding initiated prior to a criminal trial. The <u>Idowu</u> court noted that other circuits have held that jeopardy attaches either when "the trier of fact begins to hear evidence at a judicial forfeiture proceeding" or when "there is an order for final administrative action against the defendant's property." <u>Id.</u> at 396. In that case, the court ruled that jeopardy did not attach until the swearing in of the jury in the criminal trial, because no evidentiary proceedings were held in the forfeiture action before that point. <u>Id.</u> at 396-97. Therefore, the Second Circuit in <u>Idowu</u> did not need to decide the question of whether evidentiary proceedings on an application for provisional remedies would trigger double jeopardy, which is the question before the court here.

7

The Supreme Court has stated that "jeopardy does not attach until a defendant is put to trial before the trier of the facts, whether the trier be a jury or a judge." Serfass v. United States, 420 U.S. 377, 391 (1974) (internal quotations omitted). The Court went on to clarify that the trier must have "jurisdiction to try the question of the guilt or innocence of the accused." Id. In a proceeding for provisional remedies, the court does not have jurisdiction to try the guilt or innocence of the defendant on the ultimate question of forfeiture. The jurisdiction of the court at that stage is limited to determining whether an order for provisional remedies should be issued. Thus, in the instant action, jeopardy could not have attached in the forfeiture action itself when the court heard evidence related to the application for provisional remedies. Consequently, the court does not need to decide the issue of whether a completed forfeiture under Article 13-A implicates double jeopardy. See Gumbs v. Kelly, No. 97-CV-8755, 2000 WL 1172350, at *16 (S.D.N.Y. Aug. 18, 2000) (unpublished). The only relevant inquiry is whether the order granting provisional remedies, in and of itself, constitutes a criminal punishment that would bar the subsequent criminal trial.

There is a two part inquiry for determining whether a punishment is civil or criminal. Id. First, courts examine whether the legislature has expressly or impliedly indicated a preference that the punishment be civil or criminal. Hudson v. United States, 522 U.S. 93, 99 (1997). Second, if the legislature has signaled that it intended to establish a civil penalty, then courts determine "whether the statutory scheme was so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." Id. (internal citations and quotation marks omitted).

Here, the New York legislature has expressly indicated that it intended the Article 13-A proceedings to be a civil penalty. The provision authorizing the forfeiture action provides that

8

"Any action under this article . . . shall be civil, remedial, and in personam in nature and shall not be deemed to be a penalty or criminal forfeiture for any purpose." N.Y. C.P.L.R. § 1311.

The court's inquiry, therefore, hinges on the second prong of the analysis as explained in Hudson: whether the order of attachment issued pursuant to Article 13-A is so punitive that it essentially constitutes a criminal penalty. The Supreme Court has provided a number of considerations to guide this analysis:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

Hudson, 522 U.S. at 99-100 (internal quotation marks omitted). The Supreme Court cautioned that "these factors must be considered in relation to the statute on its face and only the clearest proof will suffice to override legislative intent and transform what has been denominated into a civil remedy into a criminal penalty." Id.

Review of the order of attachment under these factors reveals that the Appellate Division's determination that the order of attachment in the Article 13-A action was not punitive was neither contrary to, nor an unreasonable application of, federal law. In an action for attachment, the claiming authority needs to show (1) a substantial probability that it will prevail on the forfeiture action and that the property may be destroyed, removed from the court's jurisdiction, or otherwise be unavailable for forfeiture without the order; (2) the need to ensure the availability of the property outweighs potential hardship; and (3) that the entry of the order will not diminish, impair or terminate lawful property interests of persons other than the

9

defendant(s) if the order is requested to be entered against real property. N.Y. C.P.L.R. § 1312(3).

An action for an order of attachment clearly cannot meet the high standard established by the Supreme Court for determining whether an action is so punitive in purpose or effect that it overrides the legislative intent to create a civil proceeding. An order of attachment of defendant's assets pending the outcome of the criminal proceeding does not constitute an affirmative disability or constraint. See Hudson, 522 U.S. at 104 (imposition of monetary penalties and restriction from participation in the banking sphere does not involve an affirmative disability or restraint). Moreover, an order of attachment has not historically been regarded as punishment, as its primary purpose is to ensure that assets remain available should a judgment later be rendered. The sanction does not come into place only on a finding of scienter. In order to obtain an order of attachment, the court does not need to make a final determination as to the mens rea of the criminal defendant but rather reviews the merits of the case solely for the purpose of determining whether there is a substantial probability that the claiming party will ultimately prevail in the forfeiture action. The action for provisional remedies is not intended to promote aims of either retribution or deterrence but only to secure the defendant's assets until the forfeiture action is decided. See Morgenthau v. Citisource, Inc., 68 N.Y.2d 211, 220 (N.Y. 1986) Therefore, there is clearly an alternative purpose for the attachment other than punishment.[1] Moreover, there is no indication that the statute, on its face, is excessive. The provisional remedies provision expressly provides for a balancing of the hardships on any party against the need for the order and allows for the payment of reasonable living expenses and attorneys' fees

---

[1] The court also notes that there is an alternative purpose other than punishment for the forfeiture action more generally. The primary legislative purpose for enacting Article 13-A was "to take the profit out of crime." Id. at 217 (quoting 1984 McKinney's Session Laws of NY, at 3627-3628).

and expenses for the defendant's representation in the criminal action. See N.Y. C.P.L.R. § 1312(4).

Petitioner contends that the in personam nature of the Article 13-A proceeding distinguishes it from other forfeiture proceedings found to be civil in nature because they were brought in rem. Indeed, the fact that the forfeiture proceeding in New York is an in personam action is a factor supporting petitioner's argument that double jeopardy is implicated. In reviewing past precedent related to civil forfeiture, the Supreme Court drew a distinction between in rem civil forfeiture, which is a remedial civil sanction presumed not to implicate double jeopardy, and in personam civil penalties such as fines. Hudson, 518 U.S. at 278, 289 n.3. However, regardless of whether the forfeiture action is brought in personam, it is clear that an order of attachment under Article 13-A cannot be correctly characterized as a civil penalty.

Similarly, petitioner contends that the size of the forfeiture order sought by the government–$26 million–demonstrates that it cannot be considered remedial. However, whether a forfeiture action is remedial or punitive in nature is to be determined from the face of the statute. Id. at 299. The amount of money that the government sought is irrelevant to this inquiry. Article 13-A expressly limits the total recovery of the claiming authority to "the value of the proceeds of the crime or substituted proceeds of the crime, whichever amount is greater, and the value of any forfeited instrumentality used in the crime." N.Y. C.P.L.R. §1311(8). Thus, the statute on its face is purely remedial in nature. Moreover, as explained above, the provision authorizing provisional remedies is not intended to be punitive but rather to ensure that the defendant's assets remain available should an order of judgment be entered in the forfeiture action.

Petitioner's arguments that the existence of various procedural protections and an "innocent owner" defense illustrates that the forfeiture action is punitive in nature are likewise unavailing. These would be relevant considerations for the question of whether a forfeiture proceeding under Article 13-A implicates double jeopardy but have little bearing on whether an action for provisional remedies constitutes criminal punishment. The procedural safeguards for obtaining an order of attachment or another provision remedy, see N.Y. C.P.L.R. § 1312, are similar to those put in place in many other civil actions in order to comply with due process requirements. Moreover, the mere existence of an "innocent owner" defense to a forfeiture action is not considered dispositive without further indication of an intent to punish. See Ursery, 518 U.S. at 292.

For the foregoing reasons, the Appellate Division's decision that the civil forfeiture action taken against Mr. Edmonson "does not constitute criminal punishment within the meaning of the Double Jeopardy Clause," People v. Edmonson, 300 A.D.2d at 317, was neither contrary to, nor an unreasonable application of, federal law.


**B.      *Refusal to Conduct an Individual Voir Dire about Pre-Trial Publicity***

Petitioner contends that the trial court's decision not to conduct an individual voir dire about pre-trial publicity denied petitioner his right under the Due Process Clause to be tried by a fair and impartial jury. Petitioner's allegations primarily concern two Daily News articles published prior to trial, one on April 20, 1990 and the other on April 21, 1990. See Boyle Decl., Ex. A. In relevant part, the first article referred to petitioner as the "reputed head of a violent crack gang" and the second described the alleged operation of petitioner and his co-defendants as "Crack Inc." and related an alleged prison assault by petitioner against an alleged government

informant. Id. The articles were published after six members of the jury had been sworn in and prior to the selection of the remaining jurors. Based on the articles, all defendants moved for discharge of the panel of jurors that had been selected, a mistrial and selection of a new jury panel after a voir dire about pre-trial publicity. Tr. 1092-94. The state trial court judge denied the motion, explaining that he had already admonished the prospective and sworn jurors not to read or listen to any media coverage of the trials. Tr. 1095. He further stated that he would inquire of the prospective and sworn jurors "in a general way whether anyone saw the articles" and take necessary further action if they had. Id. In a subsequent discussion with the jurors, the trial judge then repeated his admonishment not pay attention to any pre-trial publicity because "the case has to be heard in the courtroom, from the witnesses, if any, from the law as the Court gives you, then you decide the case . . . and you deliberate and make a determination of the facts after you discuss the facts with your fellow jurors." Tr. 1104-05. The trial judge then questioned sworn and prospective jurors about whether they had seen or read any articles about the trial, see, e.g., Tr. 1103-04, 1108, 1158-59; and relieved potential jurors who indicated that they could not be fair based on what they had read, see, e.g., Tr. 118-19, 1134, 1159.

During the voir dire, one juror revealed that there had been a discussion in the hallway about the articles among seven or eight prospective jurors. Tr. 1107. Based on this report of the discussion as well as the articles, defense counsel collectively moved again for a mistrial or an individual voir dire about pre-trial publicity. See Tr. 1108. The trial judge denied the motion, explaining that: (1) the juror who reported the discussion also indicated that, despite the hallway conversation, he would still be able to be fair; (2) all the sworn jurors had earlier indicated that they hadn't seen or discussed any article and they were on a separate floor so could not have heard the conversation; (3) when the remaining prospective jurors in the jury box were asked whether they had been privy to the conversation, none of them replied that they had; and (4) all

the prospective jurors will be asked whether they were privy to the conversation. Tr. 1107-09. Based on these actions, the trial judge indicated his opinion that "[i]f there's any taint[,] [w]e've taken protective measures." Tr. 1109. Counsel for one of the defendants then indicated that he was concerned that the other jurors might have been influenced hearing each of the jurors who acknowledged reading an article saying they could not be fair. Tr. 1109. In response to that concern, the trial judge explained that he had made his questions as neutral as possible by asking prospective jurors whether anything in the articles might have affected their judgment about either side. Tr. 1110. Defense counsel subsequently brought mistrial motions based on two additional Daily News articles published during trial but prior to deliberations. The trial court denied these motions because no evidence had been presented that the jury had actually read the articles and they had been repeatedly admonished not to do so. Petitioner contends that these decisions by the trial court violated his right to a fair and impartial jury because "[a]t a minimum, the trial court was constitutionally required to question the prospective jurors about the Daily News articles during an individual, sequestered voir dire." Pet'r Mem., at 40.

The Appellate Division's denial of petitioner's claim was neither contrary to, nor an unreasonable application, of federal law. Rather, it was consistent with Supreme Court precedent that grants "wide discretion . . . to the trial court in conducting voir dire in the area of pretrial publicity." See Mu'Min v. Virginia, 500 U.S. 415, 427 (1991); see also U.S. v. Casamento, 887 F.2d 1141, 1155 ("A district judge has substantial discretion in determining whether potential prejudicial publicity has affected a jury's impartiality, and a conclusion that the jury remained impartial will not be overturned on appeal absent an abuse of discretion."). This deference is based on the fact that the "judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror." Mu'Min v. Virginia, 500 U.S. at 427. In

Mu'Min, the Supreme Court held that petitioner's rights under the Sixth and Fourteenth Amendments were not violated by a jury trial in a state court in which 9 of the 12 sworn jurors had read or heard something about the case. The Court determined that group questioning of prospective jurors about whether they had read, seen or heard anything about the case and, if they had, whether they could still be impartial was sufficient to satisfy constitutional requirements. Id. at 419-20. Similarly, the trial court judge here took steps to ensure the impartiality of the jury through (1) his repeated admonishments to sworn and prospective jurors not to pay attention to any pre-trial publicity; (2) his questioning of jurors about whether they had, in fact, read or seen any media coverage about the trial or participated in the hallway conversation and, if they had, whether their ability to remain neutral would be compromised; and (3) dismissal of any juror who indicated that he could not be impartial due to the publicity. The court finds that the trial court judge acted within the scope of the considerable discretion granted to state court judges to determine the appropriate means to satisfy the constitutional requirement to ensure an impartial jury.

## C. Trial Court's Refusal to Re-open the Wade hearing

Petitioner alleges that the state trial court unreasonably rejected a claim that a testifying witness, John Prince, had viewed petitioner at a stationhouse show-up prior to identifying him from a photo array and lineup. Prior to trial, the prosecution represented that Prince identified the petitioner in (1) a July 1988 photo array and (2) a December 1989 lineup. Petitioner moved to suppress the lineup and in-court identification on the basis that they were unduly suggestive. He also alleged that he had been subject to a stationhouse show-up when he was interviewed by the police at the precinct on June 30, 1987, the night of the murder, after he arrived on his own

15

accord to provide information as a friend of the victim. At the pre-trial suppression hearing held

pursuant to United States v Wade, 388 U.S. 218 (1967), Mr. Edmonson testified that, during his

interview at the precinct on June 30, 1997, he was told that he was a suspect in the murder, was

seated facing a mirror and was asked to take off his baseball cap, leading him to believe that he

was being viewed by someone through the mirror. Tr. 44. Detective Espanet, who interviewed

petitioner that evening, testified that petitioner was not interviewed as a suspect but as a person

who was volunteering information about a murder. See Tr. 576, 566. The state court denied the

motions to suppress the in-court identification and ruled that the photo identification and line-up

were fairly conducted. Tr. 989.

At trial, John Prince testified that on the evening of the murder, he went the police

precinct to report that he had seen a murder take place. On cross-examination, Prince testified

that, while he was there, the police opened a curtain and asked him to look through it. Tr. 5051.

He testified that he told the police that he looked like the man he had seen commit the murder.

Tr. 5051-52. The court then called a recess. Prior to resuming cross-examination, defense

counsel requested that the court re-open the Wade hearing based on Prince's testimony that he

had initially viewed the witness at the precinct. Tr. 5054. Defense counsel argued that, due to a

stationhouse show-up, the witness's subsequent identifications were tainted. Id. The prosecutor

told the court that, during the break, he spoke with detectives who had been involved with the

case. One of the detectives explained that Prince was shown a man, not the defendant, through a

one-way mirror on a different evening and that Prince must be mistaken about the date of the

viewing. Tr. 5056. The prosecutor stated that no police report indicates that Prince had seen the

defendant the evening of the murder and that he was not aware of any out-of-court identifications

of the defendant by Prince other than the photo array and line-up. Tr. 5056-58. On the basis of

these representations, the court permitted counsel for the prosecution to question the witness

16

outside the presence of the jury for the purposes of establishing whether he had been mistaken. Tr. 5058. The court stated that if Prince continues to insist that he was not mistaken, the court would entertain an application from Mr. Edmonson for a hearing outside the presence of the jury on whether a show-up existed and, if it had, whether a sufficient independent source for the identification existed. Tr. 5059. When Prince resumed the stand, he testified that the stationhouse identification in fact took place three days subsequent to the murder, when he arrived at the precinct on an unrelated matter. Tr. 5063-64, 5071-72. Following Prince's testimony, the trial court judge held a meeting with counsel outside the presence of the jury. The judge concluded that "I think it is clear that the witness, Mr. Prince, did not see Mr. Edmonson at the precinct on the 30th. It is also clear that the person that he said looked like the person in the red car three days later was also not Mr. Edmonson, so that works to [the defendant's] advantage." Tr. 5073. The judge suggested that the defense and prosecution agree on a stipulation for the jury that the person who Prince viewed was not Mr. Edmonson. Tr. 5075. Defense counsel agreed that there was no reason to re-open the Wade hearing, Tr. 5080, and petitioner pro se moved for a mistrial based on the change in the witness's testimony on whether there was a stationhouse show-up.

The court finds that the trial court's conclusion that no stationhouse show-up took place was not an unreasonable determination of the facts in light of the evidence presented at trial. The trial court's finding was based on the witness's sworn testimony. Given that approximately three years had passed between the date of the murder and the date of trial, it would not be surprising for Mr. Prince to be confused about the chronology of events. As none of the detectives involved in the case nor any police records indicated that Mr. Prince had identified the defendant the night of the trial, it was not improper to allow the prosecution to ask the witness whether he might have been confused about which night the viewing took place. There is no indication from the

17

record that the witness would have a motive to change his testimony in order to please the prosecution. Moreover, the only evidence presented at trial by Mr. Edmonson in support of his contention that there was a stationhouse show-up the evening of the murder was his representations that he was interviewed in front of a mirror and was told to remove his baseball cap. While these representations are consistent with Prince's initial testimony on the time of the viewing and that the person he viewed had a baseball cap on at one point, it would not be unreasonable for the trial court to find Mr. Edmonson's view of the facts unpersuasive. Furthermore, the trial court's proposed resolution of the issue—for counsel to stipulate that Mr. Prince viewed someone other than Mr. Edmonson on the day of the murder—was potentially more damaging to the prosecution's case than a finding of a stationhouse show-up. Through the stipulation, the prosecution admitted that, three days after the murder, its witness had identified someone other than Mr. Edmonson as the person who looked like the murderer. This information substantially undercut the credibility of Prince's in-court identification, particularly because trial counsel established on cross-examination that Prince's first identification of Mr. Edmonson to the police took place over one year after the murder. Thus, any error by the trial court would be harmless.

Petitioner contends that additional documents obtained by petitioner subsequent to trial through New York's Freedom of Information Law, which were presented to the Appellate Division in the consolidated direct appeal and § 440.10 action, support his claim that Prince viewed Edmonson at the police station on June 30, 1997. On this basis, petitioner argues that the Appellate Division's dismissal of petitioner's Wade hearing claim was based on an unreasonable determination of facts under 28 U.S.C. § 2254(d)(2). However, none of the documents presented contain any information regarding whether an identification procedure took place on the date in question. The document dated September 29, 1987, which is from petitioner's parole file, relates

a telephone conversation between Detective Parker and petitioner's parole officer on July 2, 1987. The report states that the parole officer was told that "Sam Edmonson was questioned in the murder of Kenneth Rankin. They felt that Sam Edmonson had set Mr. Rankin up to be murdered. At the time, they were only questioning the subject." Boyle Decl., Ex. B. The additional documents establish that the police had evidence implicating the petitioner in the commission of the crime on the day of the murder, based on his ownership of the grey Audi the victim was driving at the time he was murdered and a red Audi that matched the description of one seen at the crime scene. See Boyle Decl., Ex. C, D, & E.[2] Petitioner argues that these documents are significant because they support Mr. Edmonson's allegation that he was a suspect in Rankin's murder at the time he arrived at the police station. In particular, a transcript from the police interview of Prince on the night of the murder showed that Detective Espanet was present at that interview prior to his interview with Mr. Edmonson. Thus, according to petitioner, the documents provide a reason why police might have subjected him to an identification procedure when he arrived at the station and show that there was no reason that police would have exhibited another person to Prince three days later. However, petitioner's argument is purely speculative and, therefore, the Appellate Division's dismissal of petitioner's claim relating to the Wade hearing was not objectively unreasonable.

### D.   *Ineffective Assistance of Trial Counsel*

Petitioner raises six bases for his claim that he was denied effective assistance of trial counsel: (1) insufficient preparation for trial; (2) failure to impeach prosecution witness Kyle

---

[2] According to the respondent, this latter set of documents was provided to petitioner's defense attorney prior to trial.

Patterson with inconsistent testimony given at another trial; (3) (a) failure to impeach and (b) eliciting harmful testimony from prosecution witness John Prince; (4) failure to object to admission of a photo array during the testimony of John Prince;[3] (5) waiver of a Brady/due process claim; and (6) calling an inappropriate alibi witness for the wrong day.[4]

## 1. *Exhaustion of Ineffective Assistance of Counsel Claims*

In general, petitioner must exhaust available state remedies before seeking federal habeas relief. See 28 U.S.C. § 2254(b)(1) (A); see also O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Daye v. Attorney General, 696 F.2d 186, 190 (2d Cir. 1982) (en banc). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have fairly presented to the state court "both the factual and legal premises of the claim he asserts in federal court." Daye, 696 F.2d at 191. "[D]ismissal is not required when evidence presented for the first time in a habeas petition supplements, but does not fundamentally alter, the claim presented to the state courts." Caballero v. Keane, 42 F.3d 738, 741 (2d Cir. 1994).

---

[3] The claim of ineffective assistance of counsel due to failure to object to admissibility of the photo array was raised in a letter on March 4, 2006. As this subclaim was exhausted in state courts and arguably relates back to petitioner's discussion of admission of the photo array in his memorandum of law, the court considers it.

[4] In his memorandum of law, petitioner asserted an additional ineffective assistance of counsel sub-claim, namely that trial counsel elicited harmful testimony from prosecution witness Keith Christmas. However, in his reply, petitioner appears to have withdrawn this claim by acknowledging that it was counsel for a co-defendant who elicited the harmful testimony. Pet'r Reply, at 28 n.13.

Pursuant to AEDPA, a district court may, in its discretion, deny on the merits habeas petitions containing unexhausted claims, so-called "mixed petitions." See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."); see also Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002) (recognizing that the district court may deny on the merits unexhausted habeas claims). "The law is unsettled in the Second Circuit regarding the proper response to habeas petitions containing unexhausted claims. A majority of district courts in the Second Circuit dismiss unexhausted claims that are 'patently frivolous.'" Wheeler v. Phillips, No. 05 Civ. 4399, 2006 WL 2357973, at *5 (E.D.N.Y. Aug. 15, 2006); see also Wilson v. Goord, No. 00 Civ. 4849, 2004 WL 226149, at *3 (S.D.N.Y. Feb. 6, 2004); Naranjo v. Filion, No. 02 Civ. 5449, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003).

Petitioner's ineffective assistance of counsel claim is partially exhausted and partially unexhausted. It is uncontested that petitioner fairly presented to the Appellate Division his subclaims that counsel was ineffective due to: (1) ineffective preparation for trial; (2) failure to impeach Kyle Patterson; (3)(a) failure to impeach John Prince; and (4) failure to object to admission of a photo array during the testimony of John Prince. Thus, these subclaims of petitioner's ineffective assistance of counsel claim have been exhausted and are properly before this court.

However, respondent contends that defendant did not fairly present the following three claims to the state court: (3)(b) eliciting harmful testimony from John Prince; (5) waiver of a Brady/due process claim; and (6) calling an alibi witness for the wrong day. With regard to the subclaim that trial counsel elicited harmful testimony from John Price, the court finds that this argument is merely a factual supplement to the petitioner's critique of trial counsel's cross-

21

examination of John Prince in his brief to the Appellate Division. Therefore, the claim is exhausted and the state court's dismissal of it should be reviewed under AEDPA deference. The court finds that petitioner has not satisfied the exhaustion requirement with respect to the subclaims of wavier of a Brady/due process claim and calling an alibi witness for the wrong day. The court finds that the Brady/due process subclaim is "patently frivolous" so will consider this unexhausted subclaim so as to dismiss it.

The court finds that petitioner's subclaim that trial counsel erred by calling an alibi witness for the wrong day should be deemed exhausted but procedurally barred. Claims that are unexhausted in the state court may be deemed to be exhausted and procedurally barred if the state court to which he would be required to present his claim would find the claim procedurally barred. See Gray v. Netherland, 518 U.S. 152, 162, 116 S.Ct. 2074, 2080 (1991); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994); Grey, 933 F.2d at 119. A federal court can examine a petitioner's habeas claims despite a procedural default only if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 735, 111 S.Ct. 2546, 2557 (1991). Mr. Edmonson did not raise this subclaim in his consolidated direct appeal and § 440.10 motion. Thus, no state court has been presented with this issue. Petitioner cannot again seek collateral review under a motion to vacate judgment, see N.Y. Crim. Proc. Law § 440.10(2)(c) (barring collateral review if sufficient facts appeared on the record to have permitted the claim to be raised on direct review but defendant unjustifiably failed to raise it). The facts underlying this claim would have been apparent from the face of the record. Mr. Edmonson makes no claim of cause and prejudice for his failure to raise this issue at an earlier stage, nor does he show that dismissing this subclaim would result in a fundamental miscarriage of justice. Nothing in the

22

record of this case provides any indication that he could not have brought the subclaim claim before the state courts. Since Mr. Edmonson's subclaim of ineffective assistance of counsel based on calling an alibi witness for the wrong day could have been raised on direct review but was not, it is deemed exhausted and procedurally barred and is therefore dismissed.

## 2. *Merits of Ineffective Assistance of Counsel Claims*

A petitioner seeking to attack his conviction based on ineffective assistance of counsel must: (1) show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-89 (1984).

In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. As explained by the Supreme Court,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

Id. at 690-91. Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices.'" Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 690). Thus, a petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his

23

counsel's strategy. See Strickland, 466 U.S. at 689. However, failure to pursue a particular course of action is not considered strategic when it is not a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." See Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001). A court need not decide both prongs of the Strickland test for ineffective assistance of counsel if a party has made an insufficient showing on one. See Strickland, 466 U.S. at 697. Under the deferential standard established by AEDPA, the court concludes that the state court's dismissal of Mr. Edmonson's ineffective assistance of counsel claim was neither contrary to, nor involved an unreasonable application of, federal law.

(1) Insufficient preparation

Petitioner contends that his claim of ineffective assistance of counsel is buttressed by trial counsel's representations prior to trial that he was unprepared. Petitioner was represented at trial by Claude Tims, who was assigned to represent Mr. Edmonson in December 1989.[5] Mr. Edmonson points to three specific representations by trial counsel prior to trial. First, petitioner requested new counsel prior to a pre-trial conference held on February 27, 1990, contending that Tims had not been preparing for trial. At the pre-trial conference, Tims told that the court that he would not be prepared for the upcoming trial because he had begun a trial in federal court. The court denied Mr. Edmonson's motion, noting that he had two previous lawyers and the case was already a year old. The trial court ordered Tims to spend as much time as possible preparing for the trial. Second, at the next conference on March 22, 1990, Tims told the court that he would not be ready for the pretrial hearings scheduled for August 2, 1990. He requested to be relieved

_____

[5] Tims replaced another assigned counsel. Prior to that, Mr. Edmonson was represented by retained counsel.

24

and requested one month's adjournment. The trial court denied Tims' requests, stating that he would have time to prepare for the pre-trial hearing between March 22 and April 2 and for trial between April 9 until April 23. Third, petitioner's assigned investigator wrote to the court on April 11, 1990, approximately two weeks prior to trial, stating that the case had not been prepared. See Pet. Mem., at 50-51; Resp. Mem., at 97-98.

The court considered these representations by trial counsel and his assigned investigator in deciding petitioner's claim of ineffective assistance of trial counsel. However, in and of themselves, they do not demonstrate that trial counsel was unprepared or that his conduct failed to comply with the two-pronged Strickland test. Unless shown otherwise, the court presumes that trial counsel complied with the trial court's orders to prepare for trial and that the time allotted for this task was sufficient.

(2) Failure to impeach Kyle Patterson

Petitioner claims that his trial counsel was ineffective because he failed to impeach a prosecution witness, Kyle Patterson, with inconsistent testimony given at another trial. At Mr. Edmonson's trial, Patterson testified for the prosecution as an accomplice witness in the shooting death of William May. Patterson testified that he participated in a plan to kill May along with Mr. Edmonson, a man known as "Pipeman," and Mr. Edmonson's co-defendant, John Amante. On direct examination, Patterson testified that he was driving the car with the other three men when they picked up May on the day of the murder and that, after he stopped the car and got out, he heard and saw Pipeman fire shots that struck May. See Tr. at 3105-06. When testifying against another of Mr. Edmonson's co-defendants in a previous criminal trial, Patterson also admitted driving to the area where May was shot and stated that he knew there was going to be a

25

shooting. However, when asked during cross-examination, "How many times was William May shot in front of you?", he responded, "I don't know. I wasn't there when he got shot." People v. Johnny Ray Robinson, Ind. No. 4305/88, Tr. 2726 (Boyle Aff., Ex. F). It is uncontested that trial counsel had a copy of the transcript from the Robinson trial, but he did not use this portion of Patterson's prior testimony to impeach the witness.

The court finds that, although use of this testimony as impeachment material might have been useful, trial counsel's failure to impeach Patterson on this basis did not constitute ineffective assistance of counsel. Patterson's testimony in the Robinson trial that he was not there when May was shot was arguably contradictory to his testimony in Mr. Edmonson's trial that he saw and heard Pipeman fire shots and saw them strike May. However, "[d]ecisions about whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (internal quotations omitted). Here, it is possible that trial counsel did not use May's earlier testimony to impeach him, because the remainder of his testimony relating to the May shooting was consistent with his account of the events in the Robinson trial. In particular, Patterson's testimony that he, along with Mr. Edmonson, participated in a plan to shoot May and that he drove the car in which May was shot was not contradicted. Even if Patterson was confronted on cross-examination by his previous testimony, it would not likely have helped Mr. Edmonson very much and may have served to reinforce the aspects that were consistent. Thus, trial counsel's actions fall within the wide range of acceptable professional assistance, particularly in light of the length and complexity of this seven-week trial. Furthermore, Mr. Edmonson is not able to establish that he was prejudiced by trial counsel's failure to use Patterson's prior testimony to impeach him. Even if Patterson had admitted that he was not present at the time of the actual shooting, the witness provided

26

sufficient details as to Mr. Edmonson's participation in the plan to kill May and Mr. Edmonson's presence in the car in which May was killed on the day of May's death for the jury to have still found Mr. Edmonson guilty of acting in concert to murder May.


(3) <u>Failure to impeach and eliciting harmful evidence from John Prince</u>

Petitioner further alleges that another example of trial counsel's ineffectiveness was his cross-examination of non-accomplice witness John Prince, specifically his failure to impeach Prince's testimony with prior inconsistent statements made to the police and by eliciting harmful information. Petitioner contends that Prince's statements at trial regarding the shooting death of Kenneth Rankin were inconsistent with the audiotaped transcript of Prince's interview with Assistant District Attorney, Eric Olson, on June 30, 1987. At trial, Prince provided a description of the man he saw in a red car, who he identified at trial to be Edmonson. Prince also stated that he saw the driver stick his head outside the car. Tr. at 5002. However, when Prince was interviewed on June 30, 1987, the only description of the person he saw in the red car that he gave to ADA Olson was that he was a black male with dark skin. He also told ADA Olson that he heard the "boys" in the red car speaking with the driver of a grey car without mentioning, as he had at trial, that he saw a man sticking his head out the window of the red car. <u>See</u> Boyle Decl., Ex. E, at 14. Petitioner's claim that counsel forwent valuable impeachment material by not confronting Prince with the previous interview is without merit. There is no direct contradiction between Prince's statements. The fact that he provided a less detailed description of the person in the red car when interviewed by ADA Olson does not necessarily discredit his description in the stand, particularly because he was not asked then to describe the man in the red car in detail. Trial counsel did not fall below an objective standard of reasonableness in failing to

27

make this point, and, moreover, petitioner has failed to show that counsel's failure to do so was sufficiently damaging to constitute prejudice. Furthermore, trial counsel did press Prince during cross-examination about the description he initially gave to the police of the man in the red car. Prince responded by stating that, when he reported the incident to the police, he described the man he saw in the red car as stocky, with dark skin, and a short haircut with brown color on the side of his head. Tr. at 5050. This exchange suggests that trial counsel may have initially wanted to use the vague description given by Prince in the audiotaped interview against him but was deterred from doing so when the witness relayed a more detailed description that he could have provided prior to the audiotaping. Thus, while petitioner also contends that trial counsel was ineffective for eliciting this detailed description of petitioner on cross-examination, there could have been a strategic purpose behind this line of questioning: to illustrate the vagueness of Prince's initial descriptions of the perpetrator to the police. The fact that, through the lens of hindsight it appears that the witness's more detailed answers might have been more likely damaging to the defense than helpful, does not illustrate that trial counsel was ineffective.

Similarly, petitioner alleges that trial counsel was ineffective because he elicited from Prince the fact that he identified petitioner's photo in a photo array approximately a year after the murder. Petitioner contends that this line of questioning "opened the door" to admission of the photo array on re-direct, as photo identifications are usually inadmissible under New York law.[6] However, there is a clear strategic purpose for counsel's questions about Prince's initial identification: the fact that he did not identify Mr. Edmonson to the police until a year after the incident could decrease the credibility of the witness's in-court identification. Moreover, this

---

[6] The court notes that this point contradicts petitioner's argument in the next section that trial court was ineffective for not objecting to admission of the photo array on re-direct because photo array evidence is not admissible even if the defendant opens the door on cross-examination.

28

conversation was directly preceded by the exchange in which trial counsel elicited from Prince that, three days after the murder, he identified through a police window someone who looked like the man in the red car. Tr. at 5064. As both parties subsequently stipulated that the person Prince viewed through the window was not the petitioner, Prince's testimony that he did not identify petitioner to the police until a year later appears quite useful to the defense. Consequently, petitioner has failed to show that trial counsel's cross-examination of Prince was either objectively unreasonable or prejudicial.

## (4) Failure to object to admission of the photo array

Petitioner argues that trial counsel's failure to object to admission of the photo array on re-direct constituted ineffective assistance of counsel. Petitioner's claim is based on the contention that, under New York law, the fact of photo array identification is admissible if defense counsel opens the door, but the array itself remains inadmissible. See People v. Wilson, 195 A.D.2d 493, 494 (N.Y. App. Div., 2d Dep't 1993). Petitioner, therefore, contends that trial counsel should have objected to the admission of the photo array into evidence on re-direct. However, petitioner has failed to show that the inadmissibility of the photo array on re-direct, even after defense counsel brings out the existence of the photo identification on cross-examination, is so clearly established under state law that failure of trial counsel to object to its admission would be objectively unreasonable. Moreover, petitioner has failed to establish prejudice under the Strickland standard. Prince had already identified petitioner in-court as the person he saw at the scene of the Rankin murder, one of petitioner's co-conspirators testified that petitioner was involved, and other circumstantial evidence pointed to petitioner's guilt.

29

Petitioner has failed to show that admission of the photo array into evidence was sufficiently damaging to have changed the likelihood of the jury's verdict.

### (5) Waiver of *Brady*/due process claim

Petitioner also argues that trial counsel was ineffective because he agreed to waive a potential claim under Brady v. Maryland, 373 U.S. 83 (1963), with reference to the stipulation referred to above. When the trial court initially proposed the parties stipulate that the person who Prince initially identified was not petitioner, Tims stated that this information should have been turned over by the state as an exculpatory identification and stated, for the record, that the defense was not waiving any rights by accepting the stipulation. Tr. at 5077. The trial court responded that he would not allow the stipulation if trial counsel insisted that it was Brady material. Tr. at 5077-78. The trial court stated that the purpose of Brady was satisfied when the defense brought the potentially exculpatory information to the attention of the jury through cross-examination and noted that he did not think trial counsel could have made any other use of the information had he received it prior to trial. Tr. at 5078-79. The trial court then told Tims that if he still wanted to place the Brady objection on the record, he could, and Tims replied that it was on the record. Tr. at 5079. Thus, in accepting the stipulation, trial counsel never waived the Brady claim. In fact, he made sure that it was explicitly placed on the record for the purposes of an appeal. Consequently, petitioner's criticisms are unavailing.

Moreover, petitioner's argument in his reply that trial counsel should have requested an adverse inference instruction regarding the missing third party identification evidence is insufficient to establish ineffective assistance of counsel. Considering that the trial judge had already instructed the jury that the person who Prince identified that day was not petitioner, it is

30

extremely unlikely that failure to request such an instruction could have had a material effect on the outcome.

In sum, even if trial counsel's alleged errors are viewed collectively, Mr. Edmonson has failed to demonstrate that the state courts unreasonably applied federal law in determining that trial counsel's representation was not constitutionally defective.

## E.    *Violation of the Eighth Amendment's Prohibition Against Excessive Fines*

Petitioner's claim that the $18.9 million fine imposed by the state court violated the Eighth Amendment's prohibition on excessive fines is similarly without merit. The fine was imposed pursuant to New York's Enterprise Corruption statute, which provides that persons found guilty of violating the statute:

> may be sentenced to pay a fine not in excess of three times the gross value he gained or three times the gross loss he caused, whichever is greater. Moneys so collected shall be paid as restitution to victims of the crime for medical expenses actually incurred, loss of earnings or property loss or damage caused thereby. Any excess after restitution shall be paid to the state treasury.

N.Y. Penal Law § 460.30(5). The trial court calculated the amount of the fine on the basis of testimony at trial that the average gross revenues at any one of the six sales locations run by petitioner was approximately $6,800 per day and that some locations could make up to $25,000 per day. Sentencing Hr'g 26. The court further noted that testimony at trial established that the combined revenues of the six locations exceed $175,000 per day. Id.  Based on these representations, the trial court deemed a conservative estimate of sales revenues to be $10,000 per day. Id.  The court multiplied this amount by the 630 days of the indictment, for a sum of

31

$6.3 million. Id. at 27. Pursuant to Penal Law § 460.30(5), the trial court multiplied this amount by three to reach the $18.9 million fine imposed on petitioner.

The fine imposed was not "grossly disproportional to the gravity of [the] defendant's offense," the test articulated in the Supreme Court for determining whether a fine is excessive within the meaning of the Eighth Amendment. See United States v. Bajakajian, 524 U.S. 321, 335 (1998). Relevant factors for making this determination include:

> (a) the essence of the crime of the [petitioner] and its relation to other criminal activity, (b) whether the [petitioner] fit into the class of persons for whom the statute was principally designed, (c) the maximum sentence and fine that could have been imposed, and (d) the nature of the harm caused by the [petitioner's] conduct.

United States v. Collado, 348 F.3d 323, 328 (2d Cir. 2003) (citing Bajakajian, 524 U.S. at 337-39) (internal quotation marks omitted). The instant action easily falls within these factors. The fine was imposed on the basis of petitioner's conviction for enterprise corruption under Penal Law § 460.20. Petitioner's conviction rested on testimony at trial that he was responsible for overseeing a criminal enterprise to package, distribute, and sell crack cocaine at six locations in Brooklyn. The fine was calculated on the basis of the proceeds from this criminal activity. Petitioner was clearly within the class of persons for whom the statute was principally designed. The state court's calculations seem reasonable based on the evidence presented. Significant harm was caused by the criminal enterprise that petitioner was convicted of running. In light of the gravity of this offense, the fine imposed was not excessive.

## CONCLUSION

For the foregoing reasons, the court denies the instant petition for a writ of habeas corpus. No certificate of appealability is granted with respect to any of the petitioner's claims, since the

petitioner failed to make a substantial showing of any denial of his constitutional rights. The petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253.


SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: November 29, 2006
        Brooklyn, New York

SERVICE LIST:

## **Counsel for Petitioner**

Robert J. Boyle, Esq.
350 Broadway
Suite 308
New York, NY 10013

## **Counsel for Respondent**

Kings County District Attorney
Renaissance Plaza
350 Jay Street, 19th Floor
Brooklyn, NY 11201-2908

Attorney General of the State of New York
120 Broadway
New York, NY 10271